## DE ROODE v. SHEPPEY.

Circuit Court of Appeals, Sixth Circuit.
May 13, 1929.

No. 5059.

William L. Day, of Cleveland, Ohio (Day & Day, of Cleveland, Ohio, and John S. Pratt, of Toledo, Ohio, and Donald W. Kling, of Cleveland, Ohio, on the brief), for appellant.

W. H. Boyd, of Cleveland, Ohio (Brown, Hahn & Sanger, of Toledo, Ohio, on the brief), for appellee.

Before DENISON, MACK, and HICKS, Circuit Judges.

MACK, Circuit Judge. Plaintiff appeals from the dismissal, after trial on the merits, of her second amended petition, asking for rescission of a certain release and receipt and for damages.

At the end of 1916, plaintiff's husband, Lucius Berdan, was a partner in Berdan & Co., a wholesale grocery business, of which the other partners were defendant Sheppey, his wife, C. B. Sheppey, a sister of Berdan, Sinclair Berdan, a brother, and one S. C. Walbridge. Defendant was general manager and practically in complete control of the business. Relations between plaintiff and her husband's family, including defendant, then were and continued throughout to be marked by bitterness and mutual suspicion.

In January 1917, the Berdan Company was incorporated, with capital stock of $1,-500,000. Of this, $920,000, corresponding to the aggregate of capital accounts as shown on the partnership books, was issued as 6 per cent. cumulative preferred stock; the balance was common stock. Lucius Berdan received $185,000 par value of the preferred stock and $58,000 of the common, or about 20 per cent. and 10 per cent., respectively.

The means employed for balancing the corporate books were as follows: Out of the $657,500 in the undivided profits account of the partnership, a dividend of $200,000 was declared, to be used by the partners in offsetting sums drawn by them against their capital accounts in previous years, so that there should be dollar for dollar behind the preferred stock issue. This left $457,000 of accumulated profits on the books to be attributed to common stock; i. e., $122,500

less than its par. The partnership books, however, showed an additional account of $117,800, called a "reserve for depreciation"; this was not an account representing actual accrued depreciation, but an arbitrary reserve against contingencies such as shrinkages, litigation, etc. Upon incorporation this account was transferred to capital, and the remaining $4,600 odd necessary to make a showing of par for the common stock was presumably obtained by reversing an equivalent amount of charges previously made against the 1916 profit and loss account to cover actual depreciation of the plant and machinery.

The partnership books had carried the tangible assets at cost, and this practice was continued after incorporation until modified under the following circumstances: In the early summer of 1917, the corporation procured the Manufacturers' Appraisal Company of Cleveland to make an appraisal of the entire plant at current reproduction cost, hoping that in the then unsettled state of the law of federal taxation, the higher reproduction cost could be used instead of the lower original cost as the basis for determining percentage of profit under the excess profits tax. The Appraisal Company arrived at a figure of $111,000 for the realty and of $402,055 for building and equipment; the total of this appraised value exceeded the book value by $255,615. This valuation was used in computing the corporation's 1917 profits tax return which seems to have been signed by defendant, but there was in the return an explanatory footnote showing that the figure represented book value plus "Appraisal Excess, $255,615." The property continued to be carried on the books at cost. In the spring of 1918, James Bentley, who had built the Berdan Company's building in 1902, appraised the land and building at Sheppey's request, reported a then value of $216,000 (this covered everything included by the Appraisal Company except machinery and equipment valued by it at $64,000), and advised Sheppey to continue to carry these items on the books at the figures theretofore used. However, early in 1920, the Revenue Bureau field agents, checking over the returns for 1917, informed the corporation—contrary to the law as subsequently laid down in La Belle Iron Works v. United States, 256 U. S. 377, 41 S. Ct. 528, 65 L. Ed. 998—that it might use the reproduction cost basis, and the appraisal as evidence thereof, but only on condition that the books would be revised so as to set forth the appraisal figures. The corporation's bookkeeper there-

636

upon made an entry upon the 1919 books, which had not yet been closed, under date of December 31, 1919, but as of July 1, 1917, when the appraisal was made, as follows: "Surplus $255,615.37. Difference between Book Values of Land, Plant & Equipment as taken over by the Corporation of the Berdan Co. from Berdan & Co. and the Values appraised by the. Manufacturers' Appraisal Co. per records filed." Details having relation to the accuracy of the appraisal will be hereinafter set forth.

The earnings of the business for each of the years 1913 through 1917 as reported on the books were $175,000, $150,000, $145,000, $253,000, $212,000, respectively. During the first four of these years, while the partnership existed, $46,000 out of gross earnings was annually charged to operating expenses as interest at 5 per cent. upon the partners' capital account; it was therefore not included in the profit and loss account. Dividends for the year 1917 were 6 per cent. on the preferred stock and 10 per cent. on the common.

In March, 1917, shortly after the incorporation of the Berdan Company, defendant brought an action by attachment against Lucius Berdan for the fair value of his services in managing the investments and conserving the estate of. Berdan; while this claim seems to have had legal validity; the real purpose of bringing the litigation concededly was to prevent Berdan and his wife from dissipating the property. Very soon thereafter defendant had himself appointed by the Ohio probate court as guardian of Berdan on the ground of improvidence. . By subsequent agreement among the parties the attachment suit was dismissed, Sheppey's guardianship recognized by plaintiff, and divorce proceedings instituted against her by Berdan. It was further agreed that when the divorce would be procured, plaintiff would receive alimony in the sum of $125,000 and renounce all rights whatsoever in her husband's property. Lucius Berdan made a will leaving his realty to defendant and his personalty to his brother and sister, defendant's wife, nominating defendant as the executor thereof; he died in December, 1917, just before the divorce case was to be tried.

In January, 1918, after defendant had qualified as executor, plaintiff sued to set aside the probate of the will on the grounds of undue influence and lack of testamentary capacity. In the event of success, she would have been entitled under Ohio law to the entire personal estate, consisting of the Berdan Company stock, and other securities valued at $144,000, and dower in $10,000 worth of realty. The Ohio court upheld plaintiff's contention that the alimony agreement was no bar; defendant thereupon filed an equitable plea for reformation of the agreement. After very acrimonious charges had been made by both sides, the parties negotiated the settlement and release now in dispute.

Overtures were made by Walter F. Brown, a lawyer called in by defendant and the other beneficiaries of the will at this stage of the litigation. After Brown and defendant had furnished the information now alleged to have contained the misstatements and omissions by which plaintiff claims to have been misled, a settlement was tentatively agreed upon, providing for the transfer to plaintiff of a two-thirds share *in kind* of the Berdan estate. But plaintiff, so suspicious of her opponents and also of her own counsel that she employed a private detective and planted a dictaphone in her counsel's office before his conference with Brown, broke off negotiations. Her attorneys finally induced her to make a new offer outlined in a letter she wrote to them on September 11, 1918, beginning as follows: "Prompted by what you have said and notwithstanding I know the estate is considerable more, I will agree to accept the following settlement which I regard as constituting substantially two-thirds (2/3) of my husband's estate, as represented by Sheppey."

On September 13 the formal offer was addressed by plaintiff to the attorney for the beneficiaries of the will; they accepted it a few days later. It provides:

"(1) The answer, and amended answers and cross-petitions to be withdrawn together with the charges therein contained, and a decree for plaintiff entered setting aside the will in the petition referred to.

"(2) The appointment by the probate court of Lucas county of the plaintiff in the above-named action, Evelyn O. Berdan, or her nominee, as administrator of the estate of Lucius Berdan, deceased, without bond.

"(3) The approval of the accounts of Marshall Sheppey, both as guardian of the person and estate of said Lucius Berdan and his executor of the estate, as said accounts are shown on the book of said Sheppey, as guardian aforesaid, exhibited to the undersigned.

"(4) The delivery to me of all personal property of the estate of said Lucius Berdan.

"(5) The sale to Marshall Sheppey, or order, of the preferred and common stock of the Berdan Company belonging to the said estate, for the sum of $135,000, said sale to be consummated on or before Octo-

ber 1, 1918; at whatever time the same are disbursed, accounting and payment to be made to said estate of all net profits of every nature and description earned by said stock up to the date of sale, the term 'net profits' to exclude the sum necessary for the payment of government taxes.

"(6) I to quitclaim unto Marshall Sheppey the Superior street real property and the Middle Bass lots belonging to the estate.

"(7) The costs of the suit pending in said common pleas to be paid by the administratrix, but no allowances or payments to be made to the defendants for attorneys fees, and none to be paid attorneys for services in the probate court, and no allowances or payments to defendants for the cost or expense of depositions, and said Marshall Sheppey to receive no fees or compensation as guardian or executor.

"(8) Mutual general releases to be given by and between the parties to said action and all letters referred to in the answers and other letters sent to or by me to be delivered to me.

"The foregoing proposition to be accepted or rejected by your clients by Tuesday, September 17, 1918."

All the provisions of this settlement were immediately carried out, except the accounting as to net profits. On January 16, 1920, plaintiff sued defendant and Sinclair Berdan for an accounting under provision 5; after several steps in the litigation had been taken, it was settled in 1924 by the payment to her of $21,000.

The present suit was begun in September, 1922; but a prayer for cancellation of the receipt was not joined with the demand for damages until the amended petitions of 1924 and 1926. The gravamen of the bill is that by the representations of defendant and his agents, the falsity of which was not discovered until 1922, plaintiff was induced to sell her stock in the Berdan Company for $135,-000, thinking this its true value, when in fact it was worth $350,000, and to give a receipt and release of all claims. The misrepresentations charged may be summarized as follows:

(1) That there were not enough actual net assets to equal the million and a half par value of the stock; that the corporation had begun with a concealed deficit of almost $200,000; and that this deficit was too large to be wiped out by application of the 1917 profits.

(2) That the fixed assets as of January, 1917, were worth less than a quarter of a million dollars.

(3) That the net earnings for 1917 were $130,000, and the earnings for the first months of 1918 were at a lower rate.

(4) That during the past few years there had been no audit or outside determination of the worth of the Company.

(5) That the value of the preferred stock was not greater than 80 per cent. of par and nearer 70 per cent., while the common stock had no good-will value and not enough assets behind it to make it worth par; that therefore the value of plaintiff's holdings was less than $145,000.

Many of these alleged misstatements are charged in the alternative as concealments of the correct information.

The first cause of action, asking cancellation of the receipt and release, was transferred to the equity side of the District Court; after hearing, the decree of dismissal herein appealed from was entered. The District Judge found that the circumstances were not such as to impose upon defendant any duty of furnishing information, and that there was no sufficient evidence that the misrepresentations had been either made or relied upon.

It is argued that defendant personally and through Brown assumed during the course of the negotiations the duty of disclosing all relevant information, and that in any event he was under this duty in view of his position as president and large stockholder of the Berdan Company and executor and guardian of the estate of plaintiff's husband. In our judgment the first part of this contention is not supported by the facts. Brown's direct testimony that he offered to give all information *requested* by plaintiff or her attorneys outweighs the evidence of an offer by him to furnish any and all information in defendant's possession which might have a bearing upon the value of the stock irrespective of request therefor. The direction by defendant personally to the bookkeeper Sholes in the presence of plaintiff and her counsel to "give all the information we had" must in our judgment be interpreted in the light of Sholes' position and ignorance of the state of the litigation; it could not have meant more than that Sholes was to show anything in the books which might be asked for by the parties. As to the second part of the contention, since defendant's guardianship had ended and plaintiff's status as a beneficiary of the estate had not yet arisen at the time of the negotiations, it is not apparent that there were any special circumstances, in addition to the circumstance, insufficient in itself, that Sheppey was an officer and large stockholder of the corporation, giv-

ing rise to the duty on his part to make full disclosure to one from whom he was buying stock.

■■ In any event, in our judgment, nothing material was withheld by him. Plaintiff asked for and was furnished the balance sheets for five years preceding incorporation and for January 1 and December 31, 1917, profit statements for five years, details of the plant and equipment account, and the facts concerning a certain mortgage which had been paid off out of earnings. The only significant claim of concealment other than those to be dealt with hereafter in their alternative form of alleged misstatements, concerns the Manufacturers' Appraisal Company's appraisal of the fixed assets. While the fact that the reproduction cost of fixed assets is higher than actual cost is normally unimportant in the valuation of a going mercantile business, since so long as the business continues it cannot derive benefit from such increase except in so far as higher cost may tend to discourage new competitors, nevertheless accurate information in this respect has a bearing upon the valuation of preferred stocks because it affects the probable liquidation price of the assets. But if, as here, the appraisal was clearly inaccurate, its concealment cannot be material. The valuations placed upon land and building were far out of line with the estimates of Bentley, the builder; no account was taken of obsolescence although the structure dated from 1902 and was of an antiquated type of construction; the rate of depreciation upon plant and machinery were far too low; many items were included which would not have affected the prices obtainable upon liquidation. Plaintiff strenuously insists that defendant must accept as the valuation for all purposes the figure adopted by him in his 1917 profits tax return. Apart, however, from the fact that valuations of the same property for the purposes of taxation and of sale sometimes legitimately differ, it is obvious from the face of the return that the appraisal figures were reported therein for what they might be worth, without committing the person signing the return to the admission that they represented actual value; the return speaks of "appraisal excess" in contradistinction to "book *value*." Plaintiff also relies upon the answer "No" to the question in the return, "Is any tangible property, paid in for stock, entered on the books of the corporation in excess of its actual cash value when received?" But this answer, though entirely true, is quite irrelevant to the present issue; it meant that the tangible assets were at the time being carried *on the books* at original cost.

■ We come then to the five categories of misrepresentations alleged in the complaint. What has just been said disposes of the second category, and of the fourth as well since the denial of the existence of a grossly inaccurate appraisal could not be material. Moreover, the record shows such loose and untechnical use of the words "audit" and "appraisal" by the witnesses who testified for plaintiff on this point that whether or not they meant to inquire about an outside appraisal they appear actually to have asked for an outside audit or estimate of worth, and were quite properly told that none had ever been made.

The facts in connection with the opening of the corporate books on January 1, 1917, hereinabove recited at length, indicate how statements made by defendant and his agents, without any untruthfulness or intended deception on their part, might well have been misunderstood by plaintiff as alleged in the charges classified above as the first category of misrepresentations. When speaking of concealed deficits, Brown and Sheppey had in mind the condition of the balance sheet, which did actually conceal the fact that the capitalization exceeded the stated capital accounts and undivided profits on hand at the end of the partnership by well over a hundred thousand dollars—i. e., by more than remained to be credited to the 1917 profit and loss account after payment of the fixed dividends. Brown thereby stated no more than was explicitly set forth in a note to the December 31, 1917, balance sheet of the Berdan Company. The testimony as to statements by him that profits were not running high enough to pay fixed dividends without leaving a deficit, which he wholly denies making, is probably due to a similar misunderstanding of what he said about the latent "deficit." In the absence of sufficient evidence to overcome Brown's denial that he reported the 1917 earnings as only $130,000, and in view of the strong possibility that what plaintiff now remembers as such a statement was in fact merely one that after the payment of fixed dividends $113,000 or $130,000 remained as the profit for the year, we likewise hold against plaintiff as to the third category of alleged false representations.

■ The only remaining charges are that the value of the stock was misstated to plaintiff. Deflated estimates of the value of property by one negotiating for the purchase thereof, even when he is in a position of superior knowledge, are not sufficient basis for **a**

charge of fraud when the other party is put into possession of all the data asked for and when therefore any statements as to value must necessarily purport to be nothing more than an opinion of what conclusions should be drawn from the data. Here again, moreover, we do not find that misstatements were made. Surely the offer to buy at $135,000 was not a representation; and the opinion that the preferred stock was not worth par, expressed during war time when the record shows that preferred stocks equally well secured and yielding a higher return sold below par, was not necessarily false or insincere. The question may be somewhat closer as to the alleged ambiguous statements concerning lack of good-will value and as to the failure to direct plaintiff's attention specifically to the bookkeeping practice, adopted in good faith long prior to the controversy, by which $46,000 of the annual earnings of the partnership were charged to operating expense as interest on capital; but even regarded in the worst light these would not constitute material misrepresentations in view of all the other data in plaintiff's possession.

If, contrary to all of the foregoing, the alleged misrepresentations should be deemed to have been proven, plaintiff would nevertheless fail because the circumstances negative reliance thereon on her part. Plaintiff was suspicious to an extraordinary degree, reiterating even to the last her distrust in defendant and his agents and her belief that he was attempting to deceive her; an accountant and private detective were employed by her to make independent investigations; some of the very conversations alleged to have contained misrepresentations were recorded by a dictaphone in a manner clearly inconsistent with any reliance upon them. Furthermore, plaintiff's letters preceding and containing her offer of settlement and the whole tenor of the previous negotiations show that she did not believe that the $135,000 paid for the stock represented its full value; she knew that there was a substantial difference constituting the inducement to defendant for entering into the compromise. The abandoned settlement gave her two-thirds of the estate *in kind;* if this one gave her two-thirds *in value,* as she said in her letter that it did, the Berdan Company stock had a value of about $300,000. It is inconceivable that the settlement meant or that plaintiff understood it to mean that defendant was to pay full value for the shares, and thus get nothing except a negligible interest in real estate for surrendering his chances of winning the litigation and his rights to compensation as guardian and executor. The fifth paragraph of settlement was an integral part of the whole transaction, not an isolated sale; the consideration for the stock was not only the sum there mentioned, but all the provisions of the settlement.

In our judgment the evidence so clearly preponderates in favor of the defendant that reference is not necessary to the heavy burden of proof resting upon plaintiffs in actions to set aside settlements of litigation such as was here involved, nor to the inferences which it is contended should have been drawn from plaintiff's nonproduction of important witnesses; we express no opinion as to the controversy over the availability of these witnesses. To avoid unduly prolonging this opinion we have also passed without consideration the affirmative defenses raised: (1) Election to continue under the settlement by the compromise of the accounting suit in 1924; (2) the statute of limitations; (3) and above all the question whether cancellation of the release would be of any benefit to plaintiff without relief against her promise to give the release, and if it would not, then whether the settlement was so far an indivisible contract that one part thereof could not be set aside without a setting aside of the whole transaction and restoration of the status quo.

Decree affirmed.